IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAMON G. STEARNES,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | CASE NO. 1:25-cv-1790<br><br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Damon Sternes filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 8. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In October 2023, Sternes filed applications for disability insurance benefits and supplemental security income, alleging a disability onset date of January 1, 2020.[1] Tr. 15. In his applications, Sternes claimed disability due to brain surgery and right-eye blindness. Tr. 274. The Social Security

---

[1]　"Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Administration denied Sternes's applications and his motion for reconsideration. Tr. 86, 96, 106, 115. Sternes then requested a hearing before an Administrative Law Judge (ALJ). Tr. 157.

In October 2024, an ALJ held a hearing, during which Sternes and a vocational expert testified. Tr. 42–89. The next month, the ALJ issued a written decision finding that Sternes was not disabled. Tr. 22–37. The ALJ's decision became final on July 9, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Sternes filed this action on August 28, 2025. Doc. 1. He asserts the following assignments of error:

> 1. The ALJ erred at Step Two of the Sequential Evaluation when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider all Plaintiff's impairments and related limitations when forming the residual functional capacity evaluation
>
> 2. The ALJ erred when she failed to support her conclusions or discuss supportability and consistency when she evaluated the opinions of the treating source.
>
> 3. The ALJ erroneously failed to comply with Social Security Ruling 16-3p when evaluating the totality of Plaintiff's symptoms.

Doc. 9, at 1.

**Evidence**

*Personal and vocational evidence*

Sternes was 40 years old on his alleged disability onset date. Tr. 35. He completed the tenth grade and worked a variety of jobs, Tr. 275, but has no past relevant work, Tr. 54.

*Relevant medical evidence*

*Vision problems and headaches*

In November 2019, Sternes went to the emergency room complaining of blurred vision "since [A]ugust." Tr. 590. He also had peripheral vision loss in both eyes. Tr. 591. Imaging showed a craniopharyngioma (non-cancerous brain tumor). Tr. 586. On December 4, Sternes underwent surgery—an endoscopic procedure through the nasal passages—to remove the mass. Tr. 517–18. At a post-operative follow-up on December 13, Sternes "complained of some occasional headaches which ha[d] improved." Tr. 514.

On December 23, 2019, Sternes called the surgery department reporting severe head pain that kept him awake at night. Tr. 509–10. The office told Sternes to increase his Advil and Tylenol doses. Tr. 510. On January 6, 2020, Sternes went to the emergency room for a severe headache that began two days before his visit. Tr. 497. He said that he had run out of his headache medications, but that he had been "doing well without them and had very minimal headaches." Tr. 497. Then Sternes had gone to a party "Saturday night," where he was exposed to "lots of cigarette … and marijuana smoke" and

loud music. Tr. 497. Sternes was treated with Tylenol and instructed to follow up with his neurosurgeon if his symptoms failed to improve. Tr. 500.

On January 22, Sternes had a post-operative follow-up and said that his "vision has improved dramatically." Tr. 489. He did not report headaches.

In March 2020, Sternes followed up with his surgeon's office and reported that his vision had returned to pre-tumor levels. Tr. 486. His visual acuity was 20/20 in both eyes. Tr. 487. His visual field was normal in the right eye. Tr. 487. In the left eye, Sternes had "a moderate temporal depression that [he] d[id] not appreciate." Tr. 487. He denied experiencing headaches "for the past 3 weeks" and he hadn't needed to use headache medication. Tr. 486. Sternes was to follow up in six months. Tr. 486.

In October 2020, Sternes followed up and had "[e]xcellent recover[y] of visual acuity and field defects in both eyes." Tr. 470. His headaches had "resolved." Tr. 476. At later appointments, Sternes denied headaches. Tr. 461–62 (April 2021), 448–49 (October 2021), 418–19 (December 2022).

Then, in early August 2023, Sternes called to ask if his upcoming MRI appointment could be fast-tracked because, two weeks before the call, he lost peripheral vision in his right eye. Tr. 414. He also reported frequent headaches. Tr. 413. About a week later, Sternes underwent a brain MRI, which showed a new or significantly increased craniopharyngioma. Tr. 410.

On September 11, 2023, Sternes underwent surgery to remove the mass. Tr. 360–62. On October 25, he visited the oncology department for radiation

4

therapy. Tr. 338. The provider stated that Sternes "has had ongoing severe headaches for which he has been referred to the headache clinic." Tr. 338. Sternes's vision had "dramatically improved in [the] right temporal field." Tr. 339, 342. His visual fields were full except for low vision in his right eye in the lower quadrant near his temple, and low vision in his left eye in the lower quadrant near his nose. Tr. 342.

In November 2023, Sternes told his social worker that he wanted afternoon appointments because his headache medication made him drowsy. Tr. 1075. He acquiesced to a morning appointment when he was told that was the only time available. Tr. 1075. In December, Sternes had an oncology appointment to discuss his radiation therapy. Tr. 1062. Sternes reported persistent headaches that he had to "sleep[] off." Tr. 1063–64.

In February 2024, Sternes had a mental disability evaluation and told the provider that he left his job in 2023 "due to losing the sight in his right eye." Tr. 1104.

In March 2024, Sternes's primary care physician, Dr. Brobbey, completed a physical medical source statement on Sternes's behalf. Tr. 1109–12. Dr. Brobbey opined that Sternes could sit and stand for one minute at a time and for less than two hours total in an eight-hour workday. Tr. 1110. Sternes would need to walk around every 60 minutes for 15 minutes at a time, for no more than two hours in an eight-hour workday. Tr. 1110. He would need to take unscheduled breaks due to muscle weakness, pain, fatigue, and

migraines. Tr. 1110. He could occasionally lift up to 10 pounds, rarely lift 20 pounds, and never lift more than 50 pounds. Tr. 1110. Sternes would be off-task 25 percent of the workday, absent more than four days per month, and was incapable of "even low stress work." Tr. 1111–12.

In April 2024, Sternes had an ophthalmology appointment. Tr. 1144. His visual acuity was "correctable to 20/20 right eye, 20/30 left eye." Tr. 1144. At an endocrinology appointment that month he reported intermittent headaches. Tr. 1146–47. In June, Sternes followed up with the oncology and radiation department. Tr. 1196. He reported doing well overall, with "unchanged" right peripheral vision loss. Tr. 1196. He denied headaches. Tr. 1196. He remained independent with his activities of daily living and the oncologist considered him clinically stable. Tr. 1196, 1198.

*Frequent urination*

In December 2019, shortly after his first brain surgery, Sternes called his endocrinologist to report frequent urination. Tr. 511–12. The doctor advised Sternes to increase his synthetic hormone dose, which Sternes took to treat his diabetes insipidus.[2]

In March 2020, Sternes followed up with his brain surgeon. Tr. 486. He said that he lost his job a few weeks before the visit because he kept having to

---

[2]  Diabetes insipidus "causes the fluids in the body to become out of balance," which "prompts the body to make large amounts of urine." https://www.mayoclinic.org/diseases-conditions/diabetes-insipidus/symptoms-causes/syc-20351269 (last visited 2/20/2026).

use the bathroom. Tr. 486. Sternes reported that the increased dose of hormone medication had reduced his urinary frequency. Tr. 486. But three to four days before his appointment he again experienced frequent urination, particularly in the evening. Tr. 486.

In October 2020, Sternes saw his endocrinologist. Tr. 472. The doctor wrote that she last spoke to Sternes in July, when he reported that "he was feeling great." Tr. 472. At the October visit, he reported increased urination during the day but not at night. Tr. 472. The doctor planned to check Sternes's bloodwork. Tr. 475.

In June 2021, Sternes told his endocrinologist that he was working as an Amazon driver, but he was having to urinate a lot and told his supervisor that "this may not work as he ha[d] … excess urination previously." Tr. 455–56. Sternes mentioned that working in the warehouse would be better, as he felt that having access to the bathroom was essential. Tr. 456. He said that the day before his visit, he urinated five to seven times during the day. Tr. 456. The doctor continued Sternes's medication. Tr. 459.

In September 2022, Sternes saw his endocrinologist and reported that he had been urinating a lot. Tr. 429. He had not taken his medication regularly, however, because he was jailed for twelve days. Tr. 429. But once he was medication compliant, his urinary frequency was better controlled. Tr. 429. He requested an accommodation letter to use the bathroom frequently for a new job he started. Tr. 425. In December 2022, Sternes told his endocrinologist that

7

his urinary frequency was controlled, Tr. 419, and the doctor continued his medication, Tr. 421.

In August and October 2023, Sternes's diabetes insipidus was considered well controlled and his medication was continued. Tr. 348, 408. During this time, Sternes again had increased urination when he was incarcerated and did not have regular access to his medication, but his symptoms resolved once he regained compliance. Tr. 401. In December 2023, Sternes visited the oncology department to discuss his ongoing radiation therapy. Tr. 1062–64. He reported getting up multiple times the night before the appointment to urinate. Tr. 1063–64.

In March 2024, Sternes called his endocrinologist and reported frequent urination. Tr. 1119. He was advised to take an extra dose of his medication, Tr. 1119, and in April and June he reported improvement with this treatment, Tr. 1146, 1196.

*State agency opinions*[3]

In January 2024, Diane Manos, MD, reviewed Sternes's record. Tr. 91–93. Regarding Sternes' residual functional capacity (RFC),[4] Dr. Manos found that Sternes could sit, stand, and walk for six hours in an eight-hour workday. Tr. 91. He could lift and carry 20 pounds occasionally and ten pounds frequently. Tr. 91. Sternes had postural and environmental limitations (no commercial driving or operating heavy machinery and no exposure to unprotected heights). Tr. 92–93. He also had vision limitations in the following areas: near and far acuity; depth perception; accommodation; and field of vision. Tr. 92. Dr. Manos explained that as a result of these vision limitations, Sternes could work with large objects frequently and small objects occasionally; occasionally work at jobs requiring depth perception; avoid jobs that required a wide range of peripheral vision; and that he "maintain[ed] the

---

[3]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[4]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

ability to avoid usual workplace hazards such as desks, chairs, [and] waste baskets." Tr. 92.

In April 2024, Venkatachala Sreenivas, MD, reviewed Sternes's record and agreed with Dr. Manos's findings. Tr. 111–13.

*Hearing testimony*

Sternes, who was represented by counsel, testified at the administrative hearing held in October 2024. When asked why he was unable to work, Sternes testified that he was constantly having headaches and needing to urinate. Tr. 56. He explained that when his tumor was removed, the removal affected his hormones, which, in turn, caused his frequent urination. Tr. 55. Sternes takes medication that reduces his need to urinate, but he has to plan when to take it. Tr. 63–64. He also gets thirsty, which makes him drink more and exacerbates the problem. Tr. 63–64. Sternes said that three or four nights a week he did not sleep well due to his need to urinate every hour, which makes him feel fatigued the next day. Tr. 63, 65.

When asked about his vision, Sternes said that before his second surgery, his doctor told him not to drive. Tr. 58. Since then, no one has told him not to drive, but Sternes doesn't drive. Tr. 59. His providers know that he doesn't drive because medical transport takes him to his appointments. Tr. 58–59. To watch television, Sternes has to sit close to the screen and wear his glasses. Tr. 59. Sometimes the screen looks blurry. Tr. 60. When he reads, he

can only see the word he's looking at and not the next word in his peripheral vision. Tr. 59.

Sternes said that he wakes up with a headache two to three times a week. Tr. 61. His providers prescribed muscle relaxers, but these don't really help. Tr. 61. So Sternes tries to "sleep the headache off." Tr. 61. Or he takes his father's Tylenol. Tr. 61. His family helps him with household chores. Tr. 61–62, 68.

The ALJ asked the vocational expert to determine whether a hypothetical individual "similar to [Sternes]" could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 69, 80. The vocational expert answered that such an individual could perform the following jobs: hotel housekeeper, routing clerk, and merchandise marker. Tr. 70, 80.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.
>
> 2. The claimant has not engaged in substantial gainful activity since January 1, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: homonymous hemianopsia, resulting in low vision in the left eye; adrenal cortical insufficiency; acquired hypothyroidism; and urethritis (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, or scaffolds; frequently perform remaining postural activities; frequently handle bilaterally; occasionally work at jobs requiring depth perception, avoid work tasks that require peripheral vision, but can still maintain ability to avoid the usual workplace hazards, such as desks, chairs, wastebaskets, etc.; avoid all work at unprotected heights, operating dangerous moving machinery or tools such as power saws or jackhammers; and no commercial driving.

6.   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was … 40 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 21–37.

## Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not

disabled. If not, the ALJ proceeds to the next step.

5.   Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than

14

a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not err at step two*

Sternes argues that the ALJ erred at step two when she "failed to include any limitations related to [Sternes's] frequent urination from his diabetes." Doc. 9, at 9–10.

At step two of the sequential evaluation, the ALJ determines whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii),

416.920(a)(4)(ii). A *severe* impairment is one that significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). An impairment is "not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds *severe* and *non-severe* impairments at step two and continues with the subsequent steps in the sequential evaluation process, any error at step two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is harmless error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *see Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) ("'[T]he fact that some of [a claimant's] impairments were not deemed to be severe at step two is…legally irrelevant' where other impairments are found to be severe.") (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *5).

Here, the ALJ found that Sternes's diabetes insipidus, which caused his frequent urination, was not severe. Tr. 22–23. The ALJ explained that Sternes's frequent urination was generally controlled by medication. Tr. 22–23. Sternes disagrees with the ALJ's conclusion and cites evidence that he believes supports a finding that this impairment is severe. Doc. 9, at 10–11. But he only disagrees with the ALJ's conclusion. He hasn't shown that the ALJ's recitation of the evidence was faulty or her conclusion was erroneous.[5] So Sternes is asking this Court to re-weigh the evidence, which this Court cannot do. *See Bass*, 499 F.3d at 509. Moreover, even if the ALJ did err when finding that Sternes's diabetes and resultant frequent urination were non-severe, which Sternes has not shown, the ALJ considered these impairments when she assessed the RFC. Tr. 27, 30–32. So any error would be harmless. *See Maziarz*, 837 F.2d at 244.

Next, Sternes complains that the ALJ "failed to address his headaches beyond a perfunctory mention that [Sternes] has headaches two to three times a week, especially upon waking." Doc. 9, at 11 (citing Tr. 27). But the ALJ did

---

[5]     Moreover, Sternes's characterization of the evidence is not accurate. The ALJ wrote that on September 15, 2022, Sternes reported that his urination "was better controlled during the day, and he had no nocturia." Tr. 22 (citing Tr. 428–32). Sternes, citing the same treatment note, says that he reported that "he urinated a lot and this caused difficulty in keeping a job." Tr. 429. But Sternes mis-reads the record. Sternes's report of frequent urination at this visit was relaying *past* information, covering a time when he didn't regularly take his medications. Tr. 429. At the September 15 visit, Sternes was back on his medication and reported that "[n]ow … his urine is better controlled during the day" and he had "[n]o nocturia." Tr. 429.

more than this; she discussed the treatment notes describing Sternes's reports of headaches, causes, treatment, and improvement, Tr. 29–30, which Sternes ignores. And the ALJ considered Sternes's headaches and frequent urination when assessing the RFC, contrary to Sternes's assertion, Doc. 11, at 1. *See* Tr. 32 (the ALJ explaining that the RFC accounted for Sternes's "neurological impairments[] and endocrine disorder").[6]

Sternes complains that the ALJ erred when she failed to evaluate his headaches under Listing 11.02B, *Epilepsy*. Doc. 9, at 12. But an ALJ only evaluates under Listing 11.02B a "primary headache disorder." *See* Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *2–4 (explaining what constitutes a *primary headache disorder*, which is independent of another medical condition, versus a *secondary headache disorder*, which is caused by "another medical condition such as … tumors."). Sternes doesn't allege that he has a *primary headache disorder* or identify evidence showing that he meets the definition such that the ALJ should have considered Listing 11.02B. *See Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 642 (6th Cir. 2013) (to show that an ALJ committed reversible error at step three, a claimant must show that there is "a substantial question about whether a claimant meets a listing."). Sternes's arguments regarding his headaches fail.

---

[6]    As the Commissioner asserts, Sternes's headaches were caused by his brain tumor, a neurological disorder. Doc. 10, at 12; *see* Tr. 26. In his reply brief, Sternes does not dispute this characterization.

*2. The ALJ did not err when evaluating the opinion evidence*

Sternes argues that the ALJ erred when she evaluated the opinion evidence. Doc. 9, at 14.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a

19

medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14

(N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Sternes challenges the ALJ's evaluation of Dr. Brobbey's opinion. Doc.

9, at 18. The ALJ considered this opinion as follows:

> The undersigned is not persuaded by the opinion of the claimant's primary care physician, Andrew Brobbey, M.D., dated March 12, 2024, opining that the claimant can sit for less than two hours in an eight-hour workday and stand/walk for less than two hours in an eight-hour workday, but he would need periods of 15 minutes of walking every 60 minutes throughout the day; he would need additional unscheduled breaks during the workday because of his symptoms; he could occasionally lift up to 10 pounds and rarely lift 20 pounds; he would be off-task 25% or more of a given workday and could not tolerate even "low stress" jobs; and he would be absent more than four days per month (5F). The undersigned is not persuaded by this opinion because it is not entirely supported by the examinations conducted by Dr. Brobbey's office (e.g., unremarkable examinations at 1F/104 (04/06/22), 1F/73-74 (08/17/23), 2F/15-16 (11/16/23), 6F/9-10 (02/15/24); the record does not appear to contain records of Dr. Brobbey examining the claimant directly). It also is not consistent with the other evidence of record, including persuasive portions of the state agency medical consultants' opinions and the claimant's more recent examinations (after his second surgery, for example, where his vision had "dramatically improved" in the right temporal field; he had 5/5 motor strength throughout; his sensation and coordination were intact; his gait was normal; and his cranial nerve examination was unremarkable (1F/11-13 (10/25/23))). Therefore, the undersigned is not persuaded by this opinion.

Tr. 34. Sternes writes that "[c]ontrary to the ALJ's rationales for discounting

the opinion of the treating physician, Dr. Brobbey had access to all the

examinations and reports." Doc. 9, at 18. But the ALJ did not say that Dr. Brobbey did not have access to all of Sternes's exam records and reports. Tr. 34.

Sternes submits that "the state agency proffered limitations which were not addressed by the ALJ," Doc. 9, at 18–19, but he doesn't identify what limitations the state agency reviewers proffered that the ALJ failed to address. To the extent that the ALJ did not find persuasive the state agency reviewers' opinions regarding the size of the objects that Sternes could handle, the ALJ explained why:

> However, as to working with large or small objects, the opinions are vague in failing to define "large" or "small," and the more complete record demonstrates that the claimant can handle frequently without differentiation as to object size.

Tr. 33. The ALJ adopted all of the remaining limitations that the state agency reviewers assessed. Tr. 26, 91–93. Sternes has not challenged the ALJ's explanation beyond generally stating his disagreement with it. Doc. 9, at 19.

In his reply brief, Sternes argues, for the first time, that the ALJ failed to address the state agency reviewers' findings that Sternes had "limited near acuity, far acuity, depth perception, accommodation, and field of vision." Doc. 11, at 2 (citing Tr. 92, 102, 112, 121). This argument is forfeited because Sternes failed to raise it in his opening brief. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) ("Time, time, and time again, we have reminded litigants that we will treat an 'argument' as 'forfeited when it

was not raised in the opening brief.'") (citation omitted)). Even if the Court were to consider this argument, it would fail. Sternes mis-reads the state agency reviewers' vision "ratings" as "limitations." *See* Tr. 92, 102, 112, 121. Other than the handling limitation, which the ALJ discussed, Tr. 33, the ALJ adopted in the RFC all of the reviewers' assessed visual limitations. Tr. 26, 92, 102, 112, 121.

### 3. *The ALJ did not err when she evaluated Sternes's reports of symptoms*

Sternes argues that "the ALJ erroneously failed to comply with Social Security Ruling 16-3p when evaluating the totality of [Sternes's] symptoms." Doc. 9, at 20.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c); Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *3. "The ALJ need not analyze all seven factors, but should show

that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

Sternes complains that when the ALJ evaluated his allegations and found them to be not entirely consistent with the record, Tr. 31–32, she "did not indicate which symptoms were not entirely consistent or inconsistent." Doc. 9, at 21–22. This is not so; the ALJ explained why she discounted Sternes's allegations regarding his vision, "other physical limitations," and need for a cane. Tr. 31–32 (discussing Sternes's objective exam findings, treatment, and medical opinions); 20 C.F.R. § 404.1529. To the extent that the ALJ didn't articulate how she evaluated each and every symptom that Sternes alleged, Sternes hasn't cited legal authority showing that an ALJ must do so. Legal authority indicates otherwise. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand."); *Dickey-Williams v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 792, 807 (E.D. Mich. 2013) ("[T]he fact an ALJ did not specifically state every piece of evidence or every symptom is not an error").

Sternes relies on *Arsham v. Comm'r of Soc. Sec.*, No. 5:22-cv-1465, 2023 WL 4133644, at *16 (N.D. Ohio June 22, 2023), in support of his argument. Doc. 9, at 22. But in *Arsham*, the court found that the ALJ "fail[ed] to provide a specific enough explanation of *why* he found Arsham's complaints inconsistent with the medical evidence." 2023 WL 4133644, at *15. Here, the

ALJ spent a page and a half explaining her reasons, Tr. 31–32, and Sternes hasn't described why he believes this explanation isn't "specific enough." Indeed, it is Sternes who has failed to identify with specificity the portions of the ALJ's analysis he believes are improper. Simply put, Sternes hasn't shown that the ALJ erred when she evaluated his reports of symptoms.

**Conclusion**

For the reasons explained above, I affirm the Commissioner's decision.

Dated: February 20, 2026

       /s/ James E. Grimes Jr.
       James E. Grimes Jr.
       U.S. Magistrate Judge